UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ANGELA M.H.V. SKIBITCKY,

    Plaintiff,

       v.                              Civ. No. 3:19-cv-00801 (WIG)

ANDREW M. SAUL,
Commissioner of
Social Security[1],

      Defendant.


**RULING ON PENDING MOTIONS**

This is an administrative appeal following the denial of the plaintiff, Angela M.H.V.

Skibitcky's, application for Title II disability insurance benefits ("DIB") . It is brought pursuant

to 42 U.S.C. §405(g).[2] Plaintiff now moves for an order reversing the decision of the

Commissioner of the Social Security Administration ("the Commissioner"), or in the alternative,

---

[1]     The President nominated Andrew M. Saul to be Commissioner of Social Security; the Senate Confirmed his appointment on June 4, 2019, vote number 133. He is substituted pursuant to Fed. R. Civ. P. 25(d). The Clerk is directed to amend the caption to comply with this substitution.

[2]     Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. §§ 405(b)(1) and 1383(c)(1)(A). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* 20 C.F.R. §§ 404.929; 416.1429. Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967; 416.1467. If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States district court. Section 205(g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C § 405(g).

an order remanding this case for a rehearing. [Doc. #15]. The Commissioner, in turn, has moved

for an order affirming his decision. [Doc. # 18]. After careful consideration of the arguments

raised by both parties, and thorough review of the administrative record, the Court grants

Plaintiff's motion to reverse/remand and denies the Commissioner's motion to affirm.

## **LEGAL STANDARD**

Under the Social Security Act, disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant

will meet this definition if his or her impairments are of such severity that the claimant cannot

perform pervious work and also cannot, considering the claimant's age, education, and work

experience, "engage in any other kind of substantial gainful work which exists in the national

economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner must follow a sequential evaluation process for assessing disability

claims.  The five steps of this process are as follows: (1) the Commissioner considers whether

the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner

considers whether the claimant has a "severe impairment" which limits his or her mental or

physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the

Commissioner must ask whether, based solely on the medical evidence, the claimant has an

impairment which "meets or equals" an impairment listed in Appendix 1 of the regulations (the

Listings). If so, and it meets the durational requirements, the Commissioner will consider the

claimant disabled, without considering vocational factors such as age, education, and work

experience; (4) if not, the Commissioner then asks whether, despite the claimant's severe

impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work in the national economy which the claimant can perform.  *See* 20 C.F.R. §§ 404.1520; 416.920.[3] The claimant bears the burden of proof on the first four steps, while the Commissioner bears the burden of proof on the final step. *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014).

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive…." 42 U.S.C. § 405(g). Accordingly, the district court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Id.*; *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to first ascertain whether the Commissioner applied the correct legal principles in reaching his conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, a decision of the Commissioner cannot be set aside if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla or touch of proof here and there in the record." *Id.* If the

---

[3] DIB and SSI regulations cited herein are virtually identical. The parallel SSI regulations are found at 20 C.F.R. §416.901 et seq., corresponding to the last two digits of the DIB cites (e.g., 20 C.F.R. §404.1520 corresponds with 20 C.F.R. §416.920).

Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

## I.  BACKGROUND

### A. Facts

Plaintiff filed her DIB application on August 16, 2016, alleging an onset of disability as of March 1, 2014. Her claim was denied at both the initial and reconsideration levels. Thereafter, Plaintiff requested a hearing. On March 30, 2018, a hearing was held before Administrative Law Judge Alexander Peter Borre ("the ALJ"). Plaintiff, who was represented by counsel, and a vocational expert ("VE"), testified at the hearing. On April 19, 2018, the ALJ issued a decision denying Plaintiff's claims. Plaintiff timely requested review of the ALJ's decision by the Appeals Council. On March 26, 2019, the Appeals Council denied review, making the ALJ's decision the final determination of the Commissioner. This action followed.

Plaintiff was forty-nine years old on the alleged onset date. (R. 24, 61). She completed high school and is able to communicate in English, and has past relevant work as a Therapeutic Rec. Worker and Teacher Aide. (R. 24). Plaintiff's complete medical history is set forth in the Statement of Facts filed by the parties. [Doc. ##15-1; 18-2]. The Court adopts these statements and incorporates them by reference herein.

### B. The ALJ's Decision

The ALJ followed the sequential evaluation process to determine whether Plaintiff was disabled under the Social Security Act.

At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of March 1, 2014. (R. 16). At Step Two, the ALJ found Plaintiff had

the following severe impairments: bipolar disorder and borderline personality disorder. (R. 16).

At Step Three, the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (R. 17-18). Next, the ALJ determined Plaintiff retains the following residual functional capacity[4]:

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: She can perform simple, repetitive tasks, in an environment involving no public interaction, occasional interaction with coworkers and supervisors, and no strict production quotas.

(R. 19).

At Step Four, the ALJ found that, through the date last insured, Plaintiff was unable to perform her past relevant work. (R. 24). Finally, at Step Five, the ALJ relied on the testimony of a vocational expert to find that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 24-25). Accordingly, the ALJ determined that Plaintiff was not disabled from March 1, 2014, the alleged onset date, through April 19, 2018, the date of the ALJ's decision. (R. 25-26).

## II.    DISCUSSION

### A.  Evaluation of Opinion Evidence

Plaintiff argues that the ALJ erred in evaluating the opinions of her treating psychiatrist Dr. Tello and psychologist Dr. Ries. [Doc. #15-2 at 20-23].

The treating physician rule provides that a treating source's opinion on the nature or severity of a claimant's impairments will be given controlling weight when it is well-supported by, and not inconsistent with, other substantial evidence in the record. *See* 20 C.F.R. §404.1527(c)(2). When a treating physician's opinion is not controlling, the ALJ must consider several factors in

---

[4] Residual functional capacity ("RFC") is the most a claimant can do in a work setting despite his or her limitations.  20 C.F.R. §§404.1545(a)(1); 416.945(a)(1).

determining how much weight it should receive. *See Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). Those factors include "(1) the frequently, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013); 20 C.F.R. § 404.1527(c)(2). After considering these factors, the ALJ is required to "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004). In so doing, the ALJ must provide "good reasons" for the weight assigned. *Burgess,* 537 F.3d at 129. An ALJ's failure to provide good reasons for the weight given to a treating source's opinion is grounds for remand. *Halloran*, 362 F.3d at 33. An ALJ is not required to "slavish[ly] recite[]each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013).

The ALJ found that the medical evidence of record did not strongly support Ms. Skibitcky's assertion that her mental health impairments were disabling. (R. 21-24). In his decision, the ALJ adopted the opinions of Dr. Enrique Tello, the treating psychiatrist and Dr. Thomas Hill, a State Agency consulting doctor (R. 66-68 (12/27/16) and Dr. Susan Uber, a State Agency consulting psychologist (R. 78-81 (4/4/17)). The ALJ acknowledged that Drs. Hill and Uber did not have a treating or examining relationship with Plaintiff but that "the evidence is most consistent with the degree of limitation assessed." (R. 20). Plaintiff argues that Dr. Ries's opinions should have been afforded controlling weight arguing that the "opinions are by all objective measures the weightier, more probative, more believable evidence based on the intensity of treatment and the support provided for her opinions." [Doc. #15-2 at 22]. She contends that Dr. Ries's opinion was

improperly discounted under the applicable regulations for assessing opinion evidence. The Court agrees.

Here, Dr. Tello oversaw medication management for Plaintiff. The doctor saw Plaintiff on average every three and a half months for 15 minutes.[5] Indeed, in the course of their therapeutic relationship from August 30, 2013 to October 30, 2017, Dr. Tello met with Plaintiff fifteen times for a total of 3.75 hours. The doctor's responses to the State's Medical Source Statement forms were check box answers without explanation. (R. 487-91 (9/26/17); 694-98 (3/13/17)).

On September 26, 2016, Dr. Tello completed a Medical Source Statement opining that Plaintiff was well groomed, exhibited no problems with cognition, with normal speech, euthymic mood and displayed good judgment. In activities of daily living, social interaction and task performance , he rated Plaintiff "much better than average, rarely a problem." (R. 487-91).

Four days later, on September 30, 2016, Plaintiff left Dr. Ries a text message stating she needed to be hospitalized, reporting she was "becoming more and more irritable, having visual

---

[5] Dr. Tello saw Plaintiff four times in 2013 (R. 623-26 (8/30/13-New Patient Intake Summary, noting increased anxiety "related to work issues, to the point that at times feels unable to work." Noting two past psychiatric hospitalizations at Silver Hill. Intermittent FMLA paperwork was completed.), R. 621-22 (10/10/13-referral Yale Intensive Outpatient Program ("IOP")), R. 617-20 (11/13/13-noting that Plaintiff is attending IOP and working 4 hours/week), R. 613-16 (12/11/13-noting that she plans to attend IOP)); four times in 2014 (R. 521-24 (3/6/14-Plaintiff reported she had "no energy to do anything or work."), R. 517-20 (3/31/14-noting a recent evaluation at Yale psychiatric observation unit and was discharged with plans to go to IOP), R. 513-16 (9/8/14-noting that Plaintiff attended IOP from April to 1 month ago, now going to aftercare once/week), R. 509-12 (12/15/14-noting that Plaintiff is continuing IOP aftercare once/week)); twice in 2015 (R. 505-08 (3/24/15-noting that Plaintiff is continuing attendance at IOP aftercare once/week), R. 501-04 (9/13/15-same)); three times in 2016 (R. 497-500 (3/3/16-Plaintiff reporting she "feels in stable condition."), R. 493-96 (8/30/16-Plaintiff reporting that she is struggling with irritability, forgetful lately and has difficulty with simple things. "Says that she experiences "out of the body type experiences."), R. 525-28 (11/23/16-reporting "[M]ood seems to be stable, but pt feels she is unable to work."); and twice in 2017 (R. 881-84 (7/18/17/17-reporting that she is divorcing husband. "Mood seems to be stable."); R. 877-80 (10/30/17-same)). Dr. Tello saw Plaintiff for a total of 3.75 hours from 2013 through 2017.

psychosis (e.g. seeing things crawling on the walls and feeling more SI and HI."[6] (R. 823). Dr. Ries noted that a crisis worker at the hospital informed her that Plaintiff was sent home on October 1, 2016. [7] (R. 822).

On March 13, 2017, Dr. Tello completed a second Medical Source Statement. (R. 694-98). At that time he had not seen Plaintiff since November 23, 2016 (R. 525-28), and would not meet with her again until July 18, 2017.[8] (R. 881-84). He opined that Plaintiff's appearance and cognitive status were within normal limits, her speech was normal, thought content was organized, euthymic mood and good judgment and insight. (R. 695). With regard to activities of daily living he found she had an average ability using appropriate coping skills and handling frustrations appropriately and an "excellent ability" taking care of personal hygiene, physical needs and using good judgment regarding safety and dangerous circumstances. (R. 696). The doctor opined that Plaintiff's ability to socially interact was "much better than average" and her task performance was "better than average." (R. 697).

Conversely, between April 7, 2016 through January 30. 2018, Dr. Ries saw Plaintiff eighty-one times for individual psychotherapy.[9] [Doc. #15-1, Ex. A]. Therapeutic sessions lasted

---

[6] The Court notes that a review of Dr. Tello's treatment records shows that he saw Plaintiff on August 30, 2016 and on November 23, 2016. Both times he assessed Plaintiff with a GAF score of 65 and noted that she was "stable." (R. 495, 527).

[7] On September 30, 2016, Plaintiff was seen at Yale New Haven Hospital by Dr. Arman Fesharaki-Zadeh, on referral by her psychiatrist Dr. Tello, to address short term memory issues. (R. 564-67). The doctor stated "the patient's current memory difficulties are most likely due to hyperarousal, and affective disorder, which in this case is her Bipolar depressive symptoms. MRI and neuropsychological testing were recommended. (R. 567). A brain MRI dated October 15, 2016, showed "no acute or significant intracranial pathology." (R. 569-71).

[8] Dr. Tello assigned a GAF score of 65 at both the November 2016 and July 2017 appointments. (R. 527, 883). In contrast, during an IOP screening on March 1, 2017, the clinician assigned a GAF score of 40. (R. 548).

[9] Plaintiff began therapy with Dr. Ries in the Fall 2015 at Connecticut Psychiatric and Wellness Center through May 2016, and was seen by a doctor at another practice, Psychological Services

approximately an hour. On May 4, 2017, Plaintiff attended weekly group therapy with Dr. Ries[10] for 1 hour in addition to individual counseling. [Doc. #15-1, Ex. B].To put this therapeutic relationship in context, Dr. Ries saw Plaintiff on average more hours per month than Dr. Tello did during the entirety of his treating relationship which totaled 3.75 hours.

Dr. Ries (who was a LPC at the time), completed a Medical Source Statement on March 21, 2017. (R. 663-67). Plaintiff was diagnosed with Bipolar I, Borderline Personality Disorder and rule out Alcohol Use Disorder. (R. 663). Under psychiatric history, the doctor wrote, "First onset 2001 after second child born, sx were depression-sadness, crying, more sleep needed, SI, mania, + paranoid. Hospitalized at Silver Hill x2 2003 per pt report and 2007." (R. 663). The doctor described Plaintiff's response to treatment and whether she is currently being considered for higher level of care as follows,

> Pt has responded to weekly outpatient tx and seems to benefit from having 1-2x per week-increasing sessions when needed. Has been referred to IOP x2 in the past year and unable to complete due to schedule. Also of note Emergency visit in October 2017 due to increase in mania + SI sx. Hospital did not admit against this writer's opinion."

(R. 663). With regard to general appearance, Dr. Ries stated "Pt presents as well groomed, appropriate hygiene and dressed for weather. Of note pt is unable to leave home on a regular basis without grooming for an avg. 90 min due to self-esteem issues being address[ed] in course of treatment." (R. 664). With regard to cognitive status, the doctor wrote, "Pt is alert + Ox4. Pt often reports having problems with memory, attn. + concentration. Referred to Neuro + depression + anxiety seem to be root cause." (R. 664).

---

and Care, LLC, from April 7, 2016 through January 30, 2018. (R. 894). Dr. Ries was on maternity leave from approximately July 1, 2016 through September 1, 2016. (R. 828).
[10] The Administrative Record shows that from May 2017 through January 2018, Dr. Ries saw Plaintiff for 2 hours a week on average. [Doc. 15-1 Ex. A & B]. From May 2017 to January 2018, Dr. Tello saw Plaintiff for medication management twice for 15 minutes. (R. 880-84; 877-80).

Speech was described as "normal rate + tone. At times pt speaks rapidly. At times pressured when under stress." (R. 664). The doctor identified no hallucinations, delusions and obsessions, however, noting "[a]t times pt reports memory 'black outs.'" (R. 664). Mood was described as "often anxious, depressed, worried. Affect is often blunt/flat and at times inappropriate-laughing seeming [to] calm herself down or make jokes that are inappropriate, e.g., "I'd rather die." (R. 664). The doctor noted that Plaintiff had good judgment. "At times she has insight and other times lacks insight into herself + her problem." (R. 664).

Plaintiff reported past employment at a hair salon and nursing home. "Pt. reports leaving the hair salon when becoming a mother + mental health issues began. Went back to work 10 years later to nursing home + struggled with depression, anxiety, + health issues and was fired after attempting to use FMLA to get better per pt." (R. 664).

In assessing activities of daily living, Dr. Ries found that Plaintiff had a limited ability to use good judgment regarding safety and dangerous circumstances ("will at times engage in unsafe be[avior] as a result of illness + poor judgment at these times"), reduced ability to use coping skills ("when excessive stress hits-unable to use coping skills-needs supports"), and no ability to handle frustration appropriately ("is very much impacted by smaller [amounts] of stress and does not respond well on daily basis.") (R. 665).

In assessing social interaction, Dr. Ries found that Plaintiff frequently had problems respecting/responding appropriately to others in authority ("unable to respect other opinion e.g., even doctors' opinions"), and no ability to get along with others

without distracting them or exhibiting behavioral extremes ("has behavioral extremes as indicative of [Bipolar Disorder]."). (R. 666).

Finally, in assessing task performance, Dr. Ries found that Plaintiff had frequent problems in focusing long enough to finish simple activities or tasks ("has issue w/ memory, concentration which is thought to be a result of MI"), and no ability to persist in simple activities without interruptions from psychological symptoms ("psychological sx overwhelm + hold her back on a daily basis.").[11] (R. 666).

---

[11] An Intake Evaluation to an IOP program on March 1, 2017, is consistent with Dr. Ries's assessment dated March 21, 2017. (R. 544-52, 663-67).

> Client presents for intake to IOP as referred by her OP therapist who, in her referral, referenced client's increased **anxiety, depression,** psychosis (AV/HV), and alcohol abuse. Client reports being "offended" and "deceived by referral as she does not believe she has an alcohol problem, was unaware therapist would be expressing this to IOP staff, and does not want to participate in hybrid track to which she was referred.
> …
> She describes **depression** with chronic SI, most recently minutes before this intake. Hx of plans for $CO_2$ asphyxiation. No plans or intent today as she would not want to harm her children. Poor sleep, appetite, memory, focus. Recent neuropsych testing on these issues with no progressive cognitive disease identified.

(R. 544 (emphasis in original)). Mental Status Examination noted depression and a lack of insight into her situation with no concern for alcohol use despite therapist's concern. (R. 549).

Risk factors identified included episodic AH/VH hallucinations, bipolar disorder and borderline personality disorder, anxiety, active substance abuse, history of conflicted relationships. (R. 549-50). Identified general risk factors included, "[r]ecent stressful life events; [p]roblems with family/primary supports; [s]evere **anxiety**; [s]evere insomnia; [h]istory of emotional, physical or sexual abuse; [r]ecent substance abuse or dependence; [p]sychosis; [and] [p]oor alliance with treater." (R. 550 (emphasis in original)).

Reported Psychiatric Treatment History included 2 in patient hospitalizations at Silver hills, 2007 and 2008, for mania and depression. (R. 552). IOP in December 2013, and emergency room visits. (R. 552)

Dr. Ries's second Medical Source Statement is dated January 9, 2018, (R. 864-66). The doctor assessed that Plaintiff had marked limitations in all three areas of understanding and memory, with additional marked limitations in sustained concentration and persistence including ability to carry out detailed instructions, maintain attention and concentration for extended periods and to complete a normal workday and workweek without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 864). The doctor found that Plaintiff was moderately limited in her ability to carry out very short and simple instructions, perform activities without a schedule, maintain regular attendance, and be punctual within customary tolerances and to sustain an ordinary routine without special supervision. (R. 864). "Pt. is able to attend weekly sessions +group + is punctual however, pt has long standing h/o report sx increase and depression and anxiety sx do not allow her to show up to work." (R. 864).

Dr. Ries assessed that Plaintiff was unable to respond appropriately to supervision and co-workers on a sustained basis, is incapable of responding appropriately to usual work situations on a sustained basis, and cannot deal with changes in a routine work setting. (R. 865). "Pt. meets criteria for Bipolar I (F31.30) and Borderline Personality Disorder (F60.3) and as such has most difficulty with being consistent due to daily symptoms. Pt is in active treatment at this office and is making marked progress." (R. 865). Finally, the doctor assess that plaintiff was markedly limited in her ability to travel in unfamiliar places or use public transportation and moderately limited in her ability to

---

The intake clinician assessed an admit/initial GAF score of 40, and recommended IOP four times a week for 2 months. (R. 552).

responds appropriately to changes in the work setting and setting goals or making plans independently. (R. 866).

A third opinion from Dr. Ries was submitted in letter form dated January 30, 2018, providing further detail and assessment of Plaintiff's mental health treatment and status. (R. 894-96). Dr. Ries stated that Plaintiff met

> the criteria of Bipolar I Disorder and Borderline Personality Disorder and as such presents with deficits that impact her daily life []to a significant degree.
> …
> At present, Ms. Skibitcky attends weekly individual therapy, as well as an adult wellness group one day a week. Her goals are focused on her overall wellness, specifically decreasing suicidal ideation through the use of coping skills and community support.
>
> **Mental Status including important past h/o SI**
> …
> She is help seeking and has many questions about the process during today's session. She at past times presents as very depressed and reports suicidal ideation with a specific thought of taking her life by turning her engine on in her garage and sitting in car with garage door shut. She reports past h/o attempts in high school and in her "younger married years" of which she did take pills and survived. Throughout her time in treatment here, she has not had an attempt, but has had countless times of SI that was fleeing. On 2/14/17 this writer referred Ms. Skibitcky to Yale IOP due to an increase in SI. The outcome was that she was unable to follow through due to times and commitment. She agreed at that time to begin attending the Adult Wellness group here that has a component of DBT despite resistance. She has benefited from attending this group tremendously and continues to attend with almost perfect attendance.
>
> She is help seeking and focus is on being well despite anxious thoughts, feelings, and significant sx of depression. She does not present with psychotic symptoms today and reports mood as sad. She is oriented to time, place and person. Her memory is average and she reports her memory to be "very bad many times." Her intelligence is estimated to be average. Her judgment and impulse control are fair to poor. She denies both suicidal and homicidal ideation today.
>
> Pt does not meet criteria for Alcohol Use Disorder. A rule out is in place in order to continue to assess for drinking behavior. At this time, pt is not using alcohol to cope per pt report. Given manic episodes can include "binge drinking" this behavior is denoted clinically and is continued to be assessed.
> …
> **Impressions**

Ms. Skibitcky is a motivated and help seeking woman …[who] has made significant gains in therapy over the past eight months. At the present time she is currently in individual therapy since 4/7/16 at Psychological Services and Care, LLC and is under the care of this writer. She also is involved in an adult group focused on wellness and increasing coping strategies at the same location since 2/2017.

In this writer's opinion, this patient is help seeking and continues to do the best she can to continue to improve her wellness.

(R. 894-96).

Despite the lengthy and intensive nature of treatment with Dr. Ries, the ALJ assessed little weight to the doctor's opinions. A review of the entire record reveals that Dr. Ries's conclusions are not inconsistent with other substantial evidence of record. In treatment records during this period, Dr. Ries noted suicidal ideation on numerous dates (R. 835-36, 834-35, 833-34, 824-25; 823, 818, (reported calling 211 over the weekend "She reports she knew I wasn't going to kill myself, but I wanted the opportunity to talk to someone."), 811, 806, 805, 787, 781, 767 (reporting "one time having SI and calling suicide line."), 762 ("having negative thoughts about her future and struggles leading to SI"), 759 ("able to share extreme nature of her feelings and having SI"), 750 (reporting SI, denies intent), 747 (reports SI, denies intent), 745 (same), 722 (openly discusses SI); homicidal ideation (R. 829, 823);  reported feeling "out of body" (R. 833, 811); reported being tearful or depressed (R. 831, 809 (tearful and overwhelmed), 806, 805, 787, 767 (tearful "crying nonstop for the last three days), 766, 749, 745); reported feeling of "overwhelming irritability" "almost like I could kill someone"; (R. 829-30, 807, (overwhelmed and depressed), 797 (overwhelmed feeling like "I'm losing it"), 810 (reported having a breakdown), 773 (reporting "'I got in a mood' and having thoughts 'I want to put my head through a wall.'"), 767 ("tearful and stated, 'I have been crying non-stop for the last three days.'"), 756 (reported feeling overwhelmed), 750 (reporting feeling depressed and crying a lot"), 750 (sad and tearful), 749 ("feeling 'in a black cloud'…'sad and upset on a regular

14

basis'"), 741 (feeling "terrible"); reporting increased anxiety (R. 817, 816, 805, 804, 802, 798, 795, 792, 791, 788, 787, 781); ("reporting … recent increase in anxiety sx, dissociation, and loss of time."), 755 (reported having an anxious episode and going to urgent care), 752 (reporting heightened level of anxiety), 747 (reporting anxiety with panic attacks), ; unstable mood (R. 811, 805 (very depressed), 745 (feeling sad, upset, frustrated), 733 (reports feeling horrible, tearful and unable to stop crying); and manic episodes. (R. 822, 812, 663).

In June 2016, Dr. Ries noted that she was reaching out to Plaintiff's PCP to address memory problems and possible neurological symptoms. (R. 829-30).

On October 4, 2016, Ms. Skibitcky presented for a therapy session with Dr. Ries after a recent visit to the emergency room. (R. 822). Plaintiff continued to report SI and HI, although she did not appear to be manic. (R. 822). Treatment notes throughout this period show that Plaintiff regularly reported decreased sleep. (R. 822, 820, 819, 818, 817, 812, 810, 805, 801, 799). On February 14, 2017, Dr. Ries recommended a higher level of care and noted Plaintiff was open to attending YNHH IOP. (R. 797). The doctor offered an additional appointment that week until she could get started at IOP. *Id.*

On February 14, 2017, Plaintiff presented at Yale New Haven Psychiatric Outpatient Services. The intake form states, "Pt. presents w/ increasing anxiety, depression, + psychotic (i.e. hearing voices) intrusive thoughts related to life changes and stress of divorce + leaving husband…Fleeing SI increased in past month. Current help seeking. Fleeing SI no plan or intent." (R. 853). Symptoms requiring treatment included mania, anxiety, psychosis and "ETOH/substance abuse?" (R. 853). Under treatment plan/recommendations that require IOP level care, the intake clinician noted "increased stress, increased fleeing SI + concerns of AH + intrusive bizarre thoughts (e.g., "when I see red lights (driving) I think of devil)." (R. 853, 797).

On March 1, 2017, Plaintiff was seen at SRC Adult IOP PHP for an evaluation/intake appointment. (R. 537-52). On intake, Plaintiff reported

> Worsening physical sxs she associates with anxiety: upset stomach, muscle tension, insomnia, which she attributes to anxiety around terminating her marriage to her husband. Pt. reveals a mix of sxs of bipolar disorder, borderline personality disorder and anxiety. Although sxs consistent with BD not parsed at this time, she reports sense she is being watched (even while in her home) and A/VH when especially sleep deprived.

> She is bright and appropriate during interview, frequently laughs at herself, but admits this is in part bc "I don't care about anything." Says that when manic, she acts as though she doesn't have children-"I don't think of them, I forget I have them." Says she frequently has suicidal thoughts and doesn't mind dying bc "I will be with Jesus," but doesn't make an attempt bc of her children.

(R. 537). The Mental Status Examination noted suicidal ideation and passive thoughts about dying, "while in her car, will think, I could kill myself here by …." (R. 540).

> Client presents for intake to IOP as referred by her OP therapist who, in her referral, referenced client's increased anxiety depression, psychosis (AH/VH), and alcohol abuse. Client reports being "offended" and deceived" by referral as she does not believe she has an alcohol problem, was unaware therapist would be expressing this to IOP staff, and does not want to participate in hybrid track to which she was referred … Client continues to state she does not want to be breathalyzed and does not want to abstain from alcohol use as it helps her sleep.

(R. 544).

On March 16, 2017, Dr. Ries noted that Plaintiff

> continues to be upset that the [IOP] group informed her that she cannot attend [] until she go[es] through a 'drinking program.' She reports that she does not feel that her drinking is a problem and is not willing to do a treatment program and reports that her drinking[]at night is the one thing that is calming 'my nerves.'

(R. 792). Dr. Ries stated that she "was very clear with [Ms. Skibitcky] that she needs to be honest about her report of use of alcohol and understand that it is imperative for her to be honest and forthcoming with the amount of use of alcohol." (R. 793). On March 23, 2017, Dr. Ries noted that Plaintiff "advocates wanting to be seen 2x per week. Presents as anxious, worried…." (R. 791).

On May 2, 2017, Dr. Ries noted that Plaintiff needed a higher level of service, but Plaintiff continued to refuse to comply. (R. 787). "Was able to identify that she does not have the intent to kill herself; and that she continues to engage in this thinking and more recent action when she becomes anxious about the future." (R. 787). "She continues to seem to have a marked unstable sense of self, impulsivity around talking about SI, and gestures of SI that she threatens to her current boyfriend." (R. 787). "Discussed hospitalization, safety planning, and that she needs to be committed to higher level of service in order to increase chances of targeting sx that she complains of." (R. 787).

On May 4, 2017, Plaintiff started attending weekly group therapy sessions with Dr. Ries, in addition to weekly client centered psychotherapy, through January 25, 2018, for a total of twenty-six sessions. [Doc. #15-1 at Ex. B].

On October 17, 2017, Dr. Ries "encouraged [Plaintiff] to go back to Dr. Tello sooner than waiting for 2 month appointment in order to report new sx of increased anxiety and panic attacks." (R. 747). After speaking with Dr. Tello on October 24, 2017, Dr. Ries wrote,

> Had a conversation about her sx and progress she has made. He continues to wonder if she presents worse with him in order to "try to prove that she cannot work." This writer did let him know that she does continue over time to present as struggling on the "inside" and presenting as "doing well" per her grooming, dress, etc.

(R. 745). Following this conversation, Dr. Tello saw Plaintiff on October 30, 2017, for 15 minutes. (R. 877-80). He had not seen Plaintiff since July 18, 2017. (R. 881-84). The doctor noted that Plaintiff's mood was stable with a GAF 65. (R. 877, 879).

If the ALJ found Dr. Ries's Medical Source Statements inadequate or incomplete and/or unsupported by treatment records he should have requested further information. Despite the central role that Dr. Ries provided, there is no evidence that the ALJ asked Dr. Ries to provide an explanation or support for her findings. The ALJ's disbelief was

based in part on treatment notes from Dr. Tello, but as already pointed out, Dr. Tello only met with Plaintiff for 15 minute sessions and for a total of 3.75 hours. Indeed, from December 11, 2013 through October 30, 2017, Dr. Tello consistently assessed Plaintiff with a GAF score of 65, even after her release from an overnight psychiatric evaluation at Yale when she presented with "acute" psychiatric symptoms, fatigue, depression and suicidal ideation, and was held overnight for monitoring. *Compare* R. 430-46 (Yale treatment records 3/26/14-3/27/14), R. 605-08 (Dr. Tello's treatment note 3/31/14). The treating provider at Yale assigned a GAF score of 30 on admission. (R. 434). Indeed, the hospitalization treatment notes state that Plaintiff reported that "She was sent to ED by outpatient psychiatrist Dr. Tello…." (R. 431). However, Dr. Tello's treatment notes dated March 6 and 31, 2014, inexplicably make no reference to making a referral to the ED and notes that Plaintiff's condition is stable with anxiety and coping in "good control." (R. 609-12, 605-11). The Commissioner argues that "the opinion of treating psychiatrist Dr. Tello, is supported by the opinions of [the non-examining non-treating] State agency psychiatric consultant Dr. Hill and psychological consultant Dr. Uber, Plaintiff's work history, her essentially normal mental status examination findings and her level of activity…." [Doc. #18-1 at 15]. The Court disagrees.

It is very difficult to reconcile Dr. Ries's extensive treatment notes for individual and group therapy, along with the emergency psychiatric inpatient and outpatient hospitalizations and multiple IOP programs with the ALJ's assessment of Dr. Tello's and the non-examining State agency examiner's opinions. Indeed, Plaintiff's primary care physician, Dr. Lipen noted in May 2016, that Plaintiff reported having a detachment episode and was experiencing memory issues. (R. 290). Dr. Lipen's treatment note is

another example of objective evidence supporting Dr. Ries's opinions. Moreover, it cannot escape noting that in 2016, Dr. Ries met with Plaintiff individually and in group for a total of 30 hours, while Dr. Tello met with Plaintiff 3 times in 2016, for 15 minutes for a total of 45 minutes. *Compare* Doc. 15-1 Ex. A and B *with* R. 497-500, 529-32, 525-28.

For a person, such as Ms. Skibitcky, who suffers from Bipolar and Borderline Personality disorders, "the work environment is completely different from home or a mental health clinic." *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). Dr. Ries indicated marked limitations in a number of relevant work-related activities (R. 864-66), and found that Ms, Skibitcky's mental health deficits impact her daily life to a "significant degree." (R. 894). "Pt. is able to attend weekly sessions + group + is punctual however; pt has longstanding h/o report sx increase and depression and anxiety sx do not allow her to show up at work." (R. 864). "The relevant inquiry with regard to a disability determination is whether the claimant's condition prevents him from engaging in substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A)." *Morales*, 225 F.3d at 319. Here, the administrative record also includes a history of psychiatric inpatient hospitalizations in 2006 and 2007 at Silver Hills Hospital (R. 649, 657); IOP programs 2013, 2014, 2017 (R. 544-52 (2017 Yale IOP referral and intake), R. 413-15, 406 (2014), R. 461-67, 458-61, 448-50 (2013 Yale IOP); weekly IOP aftercare group, (Ex. 2F); and psychiatric emergency department/urgent care visits (R. 430-46 (2014), R. 822-23 (2016), R. 755 (2017)). This medical evidence is consistent with Dr. Ries's treatment notes .

As set forth above, during the disability period under review, March 1, 2014 through April 19, 2018, Dr. Tellos met with Plaintiff on eleven occasions for 15 minutes at a time. Careful scrutiny of the records demonstrate that the doctor barely edited his treatment notes from session to

session. For example, on March 6 and 31, September 8,  December 15, 2014, March 24,

September 3, 2015, Dr. Tello stated that Plaintiff "completed iop last week, who comes for a

follow up appointment." (R. 521, 517, 513, 509, 505, 501). Thereafter, beginning March 3, 2016,

Dr. Tello adopted the following language, "Caucasian female pt with bipolar disorder who

comes to follow up appointment." (R. 497, 493, 525, 881, 877). Similarly, in _every_ treatment

note from March 1, 2014 through October 30, 2017, Dr. Tello assessed a GAF score of 65 and

entered the _same_ psychiatric examination findings and found that Plaintiff's status was stable.

(R. 522-23, 518-19, 518-19, 514-15, 510-11, 506-07, 502-03, 498-99, 494-95, 527, 882-83, 879-

80). At best, these treatment records demonstrate poor documentation, as worst, the treatment

records are unreliable.

An ALJ who refuses to accord controlling weight to the medical opinions of a treating

psychologist must consider various "factors" to determine how much weight to give to the

opinion. 20 C.F.R. §404.1527(d)(2).

> The ALJ must consider, *inter alia,* the "[l]ength of the treatment relationship and
> the frequency of examination"; the "[n]ature and extent of the treatment
> relationship"; the "relevant evidence ..., particularly medical signs and laboratory
> findings," supporting the opinion; the consistency of the opinion with the record
> as a whole; and whether the physician is a specialist in the area covering the
> particular medical issues. *Id.* § 404.1527(d)(2)(i)-(ii), (3)-(5). *See also id.* §
> 404.1527(d) (same factors govern how much weight should be given to any
> medical opinion). We note that "[g]enerally, the longer a treating source has
> treated [the claimant] and the more times [the claimant] ha[s] been seen by a
> treating source, the more weight [the Commissioner] will give to the source's
> medical opinion," *id.* § 404.1527(d)(2)(i)

*Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).

> A single piece of evidence will not satisfy the substantiality test if the Secretary
> ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is
> evidence substantial if it is overwhelmed by other evidence—particularly certain
> types of evidence (e.g., that offered by treating physicians)—or if it really
> constitutes not evidence but mere conclusion. *See [Cotter v Harris,* 642 F.2d 700,
> 706 (3d Cir. 1981)] ("Substantial evidence can only be considered as supporting
> evidence in relationship to all the other evidence in the record.").

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

The Court finds that remand is warranted for further consideration because, given the evidence discussed above, the ALJ failed to give good reasons for assigning little weight to Dr. Ries's opinions under the factors set forth in 20 C.F.R. §404.1527(d)(1)-(6). Specifically, the ALJ failed to weigh "(1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, [and] (4) consistency" with the other objective evidence of record. *See* 20 C.F.R. §404.1527(d)(2)(i)-(ii), (d)(3)-(6); *Schlichting v. Astrue*, 11 F. Supp. 3d 190, 202 (N.D.N.Y. 2012). Since April 2016, Dr. Ries provided over 80 hours of therapy in an individual setting, [Doc. #15-1, Ex. A], and since December 2016, Dr. Ries provided 26 hours in a group setting. [Doc. #15-1, Ex. B]. To discount Dr. Ries's opinions merely because they are based on Ms. Skibitcky's "subjective report of symptoms ignores that the subjective report is not simply transcribed; it is filtered through the psychologist's training and judgment." *Thompson v. Berryhill,* 772 F. App'x 573, 581 (7th Cir. 2018). "Like a medical doctor evaluating physical pain, a psychologist must start with the patient's description of her own experience; this is not a defect. Subjective complaints are nevertheless assessed according to the profession's objective criteria; what the psychologist puts out is not a simple transcription of the patient's self-report." *Id.* "[A] psychological assessment is by necessity based on the patient's report of symptoms and responses to questioning; there is no blood test for bipolar disorder." *Aurand v. Colvin*, 654 F. App'x 831, 837 (7th Cir. 2016).

It is important to note that Dr. Ries also diagnosed Plaintiff with Borderline Personality Disorder in addition to Bipolar Disorder. Dr. Tello makes no mention of Borderline Personality Disorder in his treatment records, although the hospital and IOP program records note a dual diagnosis. Finally, on remand the ALJ will consider the impact of Plaintiff's mental health treatment would have on claimant's ability to function in a work setting.

21

Accordingly, the Court finds that additional administrative proceedings are required to reassess the weight to be given to Dr. Ries's opinions in accordance with the regulations.

The Court's role in reviewing a disability determination is not to make its own assessment of the plaintiff's functional capabilities; it is to review the ALJ's decision for reversible error. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). Therefore, this matter is remanded to the Commissioner for further administrative proceedings consistent with this ruling. On remand, the Commissioner will address the other claims of error not discussed herein. *See Moreau v. Berryhill*, Civil Action No. 3:17-CV-00396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018)("Because the court finds that the ALJ failed to develop the record, it also suggests that the ALJ revisit the other issues on remand, without finding it necessary to reach whether such arguments would themselves constitute legal error justifying remand on their own."); *Snedeker v. Colvin,* Civil Action No. 3:13-cv-970 (GLS/ESH), 2015 WL 1126598, at *8 (N.D.N.Y. Mar. 12, 2015)(finding it is pointless to address Snedeker's remaining points of error until his low back impairment is factored into a residual functional capacity finding. "The outcome of this case in its present posture will not change whether or not these additional points are meritorious or baseless. Addressing them administratively on remand, however, may avoid a second costly action for judicial review.").

III. **CONCLUSION**

For the reasons stated, Plaintiff's Motion to Reverse the Decision of the Commissioner or in the Alternative Motion for Remand for a Hearing **[Doc. #15]** is **GRANTED**. Defendant's Motion for an Order Affirming the Commissioner's Decision **[Doc. #19]** is **DENIED**.

In light of the Court's findings above, it need not reach the merits of plaintiff's other arguments. Therefore, this matter is remanded to the Commissioner for further administrative

proceedings consistent with this opinion. On remand, the Commissioner shall address the other claims of error not discussed herein.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. §636(c)(3); Fed. R. Civ. P. 73(c). The Clerk is directed to enter judgment in favor of the Plaintiff and close this case.

SO ORDERED, this 13th day of March, 2020, at Bridgeport, Connecticut.

 */s/ William I. Garfinkel*
WILLIAM I. GARFINKEL
United States Magistrate Judge